# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

MARY A. AUSTIN,

        Claimant,

vs.

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

No. 19-CV-3017-CJW

**REPORT AND RECOMMENDATION**

_____

       Plaintiff Mary A. Austin ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that she was not disabled. For the reasons that follow, I recommend that the District Court **affirm** the Commissioner's decision.

## I.    BACKGROUND

       I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 9) and only summarize the pertinent facts here. This is an appeal from a denial of DIB. Claimant was born on September 7, 1962. (AR[1] 194.) Claimant has at least a high school education. (*Id.* at 22, 238.) She allegedly became disabled due to the autoimmune disease

_____

[1] "AR" cites refer to pages in the Administrative Record.

1

Erosive Lichen Planus,[2] fibromyalgia, bipolar disorder, PTSD, chronic back pain, chronic fatigue disorder, osteoarthritis of the right hip, chronic constipation, Meniere's disease, insomnia, and obesity. (*Id.* at 237.) Claimant's original onset of disability date was July 2, 2010, but she amended it to September 7, 2012. (*Id.* at 13, 194.) Claimant filed an application for DIB on July 26, 2016. (*Id.* at 13, 194.) Her claim was denied originally and on reconsideration. (*Id.* at 115-18, 120-23.) A video hearing was held on July 10, 2018 with Claimant and her attorney, John Lander, in Mason City, Iowa and ALJ Julie K. Bruntz and Vocational Expert ("VE") Julie Svec in West Des Moines, Iowa. (*Id.* at 32-72.) Claimant and the VE testified. (*Id.* at 37-72.) The ALJ issued an unfavorable decision on October 2, 2018. (*Id.* at 10-23.)

Claimant requested review and the Appeals Council denied review on January 22, 2019. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481.

On April 26, 2019, Claimant timely filed her complaint in this Court. (Doc. 1.) On November 13, 2019, all briefing was completed and the Honorable C.J. Williams referred the case to me for a Report and Recommendation.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of

---

[2] Erosive Lichen Planus is "a chronic and painful condition affecting mucosal surfaces, mainly the mouth (oral lichen planus) and the genitals (vulval or penile lichen planus)." DermNet NZ, Erosive lichen planus, https://dermnetnz.org/topics/erosive-lichen-planus/.

not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v. Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not

3

severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to [her] application that was substantial gainful activity and lasted long enough for the claimant to learn how to

4

do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id*. §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.      *The ALJ'S Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

As a preliminary matter, the ALJ determined that Claimant last met her insured status requirements of the Social Security Act on December 31, 2014. (AR at 15.)

At step one, the ALJ found Claimant had not engaged in substantial gainful activity during the period from her amended alleged onset date of September 7, 2012 through her date last insured of December 31, 2014. (*Id*. at 16.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: degenerative disc disease, dysfunction of major joints, obesity, affective disorder, and anxiety. (*Id*.) The ALJ found Claimant's vestibular system disorder to be a nonsevere impairment. (*Id*.) The ALJ evaluated Claimant's claims under listings 1.00 (musculoskeletal disorders), 12.04 (depressive, bipolar and related disorders), and 12.06 (anxiety and obsessive compulsive disorders). (*Id*.) When crafting the RFC, the ALJ also considered the effects of Claimant's obesity on her impairments. (*Id*. at 17-18.)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id*. at 16.)

5

The ALJ also considered the "paragraph B criteria" and found, in relevant part, that Claimant had moderate limitations "with regard to concentrating, persisting, or maintaining pace." (*Id.*)

At step four, the ALJ found that Claimant had the following RFC through her last date insured:

> [T]he claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) such that she could have lifted and carried twenty pounds occasionally, ten pounds frequently; stood and walked for six hours in an eight hour workday with normal breaks; sat for six hours in an eight hour workday with normal breaks; her ability to push and pull, including the operation of hand and foot controls was unlimited within those weights; occasionally climbed ramps and stairs; never climbed ladders, ropes, or scaffolds; frequently balanced; occasionally stooped, knelt, crouched, and crawled; she would have needed to avoid concentrated exposure to hazards such as heights and moving machinery, as well as fumes, odors, dusts, gases, poor ventilation, and dust; she was limited to jobs that could have been learned in thirty days or less; and she could have had only occasional contact with the public, coworkers, and supervisors.

(*Id.* at 17.) The ALJ further found Claimant was unable to perform any of her past relevant work. (*Id.* at 21.)

At step five, the ALJ found there were jobs that existed in significant numbers in the national economy that Claimant could have performed during the relevant time period, including pricer, folder, and cleaner. (*Id.* at 23.) Therefore, the ALJ concluded that Claimant was not disabled. (*Id.*)

## B.    *The Substantial Evidence Standard*

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Moore*, 572 F.3d at 522. "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*

*v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case. *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted). The decision is not outside that zone of choice simply because the court might have reached a different decision. *Id.* (citing *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III. DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) failing to provide good reasons for the weight afforded to the post-last-date-insured opinions of Claimant's treating providers and (B) failing to properly account for Claimant's moderate deficiencies in concentration, persistence, and pace in the RFC. Claimant further argues the ALJ was not appointed in a constitutional manner. Thus, she argues the ALJ's decision must be vacated and Claimant's case remanded so a properly-appointed ALJ may adjudicate the claim.

7

**A.    *The ALJ provided good reasons for the weight afforded to the post-last-date-insured treating opinions.***

Claimant admits that no examining or treating physician opined as to her limitations before her last date insured ("LDI") of December 31, 2014. (Doc. 10 at 7.) Claimant argues that the ALJ improperly assigned no weight to four opinions in the record that she argues relate back to the relevant time period. (Doc. 10 at 7-10.)

"Retrospective medical diagnoses constitute relevant evidence concerning the degree of disability prior to expiration of the insured period." *List v. Apfel*, 169 F.3d 1148, 1149 (8th Cir. 1999). "[O]pinions from outside the insured period can only be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'" *Bannister v. Astrue*, 730 F. Supp. 2d 946, 951 (S.D. Iowa 2010) (quoting *Cox v. Barnhart,* 471 F.3d 902, 907 (8th Cir. 2006)). Each of Claimant's proffered opinions must be examined separately for "evidence concerning the degree of disability prior to expiration of the insured period." *List*, 169 F.3d at 1149 (citation omitted).

**1.  *Opinion of Joanne Robinson, ARNP***

Joanne Robinson, ARNP, became Claimant's primary care provider in January 2016. (AR at 20.) Ms. Robinson completed a checkbox opinion form on April 12, 2018. The form contained the following information from Claimant's hearing attorney:

> [Claimant] has known Fibromyalgia, Osteoarthritis, Degenerative Disc Disease of the lumbar spine, Degenerative Joint Disease of the knee, Tronchanteric Bursitis with bilateral hip pain, Tracheomalacia with shortness of breath, Meniere's, Oral Lichen Planus, PTSD, Social Anxiety, Major Depressive and Bipolar Disorders.

> February 26, 2016, x-rays indicate multilevel lower thoracic and lumbar spine degenerative disc disease and degenerative spondylosis, progressive at L1-2 and lower thoracic levels. An MRI of the L-Spine performed that same date shows broad-based disc bulges at L4-5, L3-4, and L2-3; early bilateral hypertrophic facet arthropathy at L3-4, L4-5, and L5-S1 levels; and multilevel lumbar spine degenerative disc disease. She has a positive

8

ANA of 1:320 homogenous pattern but ANA subsets were negative, and positive tender-point testing.

(*Id.* at 1179.) The form went on, "[d]ue to Mary's complaints of pain from Fibromyalgia, Bursitis, Osteoarthritis and degenerative disc/joint disease as well as balance issues from Meniere's:" (*Id.*) The form then asks a series of questions all premised on the above introductory phrase. For example, "Will Mary need to take unscheduled breaks during an 8 hour work day? YES/ NO;" and "Do you recommend that Mary be limited in how long she can sit during an 8 hour day? YES/ NO If 'Yes' how many total hours in an 8 hour workday should Mary sit?" (*Id.* at 1180.) Ms. Robinson circled YES in answer to both these questions and said Claimant should sit four hours in an eight-hour workday. (*Id.*)

> In relevant part, the form also asks the following question:

> Based upon Mary's medical history of similar pain for several years prior, and your understanding of the nature and progression of her medical conditions, specifically degenerative disc disease and Osteoarthritis, in your opinion is it more likely true than not that she would have been likewise limited as set forth above on or before 12/31/14? YES/ NO

(*Id.* at 1181.) Ms. Robinson circled YES. Ms. Robinson's "assessments, however, consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses. They cite no medical evidence and provide little to no elaboration, and so they possess little evidentiary value." *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018). She rightfully defers to an opinion regarding fibromyalgia by Dr. Singh, telling the reader to see his notes, but cites no other notes in the record. (AR at 1181.)

Claimant argues that "[w]hile Ms. Robinson began treating Ms. Austin on January 4, 2016, a prior provider at Ms. Robinson's clinic had been treating Ms. Austin since February 5, 2015, which was shortly after the date last insured. (See TR 730, 713). Ms.

9

Robinson would have had ready access to treatment notes concerning Ms. Austin's condition around her date last insured that would have informed her as to Ms. Austin's limitations before her date last insured." (Doc. 10 at 9.) The obvious flaws in this argument are (1) February 5, 2015 is not before December 31, 2014; (2) it assumes Ms. Robinson not only accessed treatment notes she had access to that were "around" the relevant time period, but also that those treatment notes contained information that established a retrospective connection to the relevant time period; and (3) that those notes supported the extreme limitations contained in Ms. Robinson's opinion. Those are assumptions I cannot make.

The pages cited by Claimant at AR 717 and 730, and presumably the notes Claimant urges the Court to assume Ms. Robinson reviewed, do not establish a disabling condition during the relevant time period. Claimant saw Dr. Steven Septer on February 3, 2015 to establish care. (AR at 730.) She was complaining of mouth soreness. (*Id.*) Dr. Septer noted that Claimant had been recently evaluated by Dr. Dettmer of ENT, Dr. Karkos in dermatology, and Dr. Singh in rheumatology. (*Id.*) Dr. Septer did not note any of those physicians' findings, other than to say the following: "She has had oral lesions that have been biopsied showing lichenoid inflammatory process. The patient has a positive ANA with 1:320 homogeneous pattern. The patient's medications are noted on medication list of 02/03/2015." (*Id.*) Thus, the only date referred to in this note is after the last date insured. Claimant also notes that on September 3, 2015, nine months after her LDI, she complained to Dr. Septer that her pain was aggravated by sitting, standing, and walking, and that she had difficulty getting out of bed without assistance and rolling over in bed. (*Id.* at 717.) This note refers to Claimant's then-current pain. Again, although the note refers to "chronic pain," it contains no time parameters. Even if it did, it does not establish the disabling level of impairment Ms. Robinson's opinion

suggests, which makes it unhelpful as support for Ms. Robinson's opinion, even if I were to assume Ms. Robinson had read this treatment note.

Claimant cites treatment notes from healthcare providers who did not work with Ms. Robinson, but who treated Claimant near her LDI. Specifically, Claimant cites treatment notes from Dr. Dale A. Armstrong, her long-time psychiatrist, to support her claim that she was disabled during the relevant time period. On June 30, 2014, Claimant reported that although her depression was better, her "anxiety was out of control." (*Id.* at 583.) However, Dr. Armstrong noted Claimant was kempt and in no acute distress; alert and oriented in all spheres; had fair insight, judgment, concentration, and attention; that her fund of knowledge was within normal limits; had no evidence of psychosis; and that she was "better not so anxious." (*Id.*) Dr. Armstrong diagnosed "major depression, recurrent, moderate" and added Zoloft to her medications. (*Id.* at 584.) On October 8, 2014, Claimant described her status as anxious and depressed. (*Id.* at 581.) Although Dr. Armstrong said Claimant appeared anxious, he found her alert and oriented to all spheres, her memory intact, insight and judgment fair, her concentration and attention within normal limits, and no evidence of psychosis. (*Id.*) Dr. Armstrong diagnosed "major depression, recurrent, moderate" and added Seroquel to Claimant's medications. (*Id.* at 582.) On November 17, 2014, Claimant reported sleep disturbance and night terrors and was crying a lot. (*Id.* at 579.) Dr. Armstrong diagnosed Claimant with "major depression, recurrent, moderate" and PTSD and added Wellbutrin to her medications. (*Id.*) The next treatment note in the record for Dr. Armstrong's clinic is on December 17, 2014, where Claimant's new mental healthcare provider, Brian Vold, ARNP noted that Dr. Armstrong had been working with Claimant on how abuse from Claimant's early life continued to impact her as an adult. (AR at 576.) Claimant felt anxious and overwhelmed at changing mental health providers after being a patient of Dr. Armstrong's for decades. (*Id.* at 577.) Mr. Vold diagnosed Claimant with "major

depression, recurrent, moderate," PTSD, and bipolar disorder type 2 and continued her on her medications. (*Id.* at 578.)

Claimant also cites various treatment notes from during the relevant time period documenting back and hip pain (*Id.* at 376, 697); arthralgia,[3] fatigue, headaches, and hand pain that made it difficult to do buttons and zippers (*Id.* at 381); persistent mouth sores that were consistent with lichen planus and possible lupus (*Id.* at 381-82, 735); and an emergency room visit for chest pain that resulted in a normal x-ray and Claimant being discharged after receiving an aspirin and .4 mg of Nitro. (*Id.* at 649-50.) When physicians performed mental health assessments during these appointments, the results were normal. (*Id.* at 375 (appropriate mood and affect, normal insight and judgment), 383 (not feeling down, depressed or hopeless, or with little interest or pleasure in doing things).)

Claimant first saw Ms. Robinson on January 4, 2016 for follow up for chronic pain syndrome. (*Id.* at 713.) While Ms. Robinson noted that Claimant "apparently has a longstanding history of back pain" and Claimant's back was tender with palpation that day (*Id.* at 713-14), those statements do not indicate disabling conditions or support the extreme limitations in Ms. Robinson's opinion during the relevant time period. Claimant's hip pain was much better after receiving injection treatment. (*Id.* at 714.) Claimant had no shortness of breath, a normal bilateral lower extremity exam, and negative straight leg raise results. (*Id.*) Her extremities had no cyanosis or clubbing. (*Id.*)

Claimant did not direct the Court to any other of Ms. Robinson's treatment notes in the voluminous administrative record that allegedly support the extreme statements in

---

[3] Arthralgia is "pain in a joint." *Durland's Illustrated Medical Dictionary* 150 (32d ed. 2012).

her opinion, and it is not the Court's job to make Claimant's case for her.[4]  *See Singer v. Harris*, 897 F.3d 970, 980 (8th Cir. 2018) (holding that when plaintiff did not direct the court to a place in the record where it could find alleged errors, the court would only consider the arguments that were supported by appropriate citations) (citing *Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017)); *see also ASARCO, LLC v. Union Pac. R.R. Co.,* 762 F.3d 744, 753 (8th Cir. 2014) ("Judges are not like pigs, hunting for truffles buried in briefs or the record.") (noting internal quotation marks omitted); *Perrigo v. Colvin*, No. 12-CV-4102-DEO, 2014 WL 1234479, at *7 n.3 (N.D. Iowa Mar. 25, 2014) (same) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

It was not enough for Claimant to show that she was diagnosed with back and hip pain and mental impairments prior to her LDI; she had to present evidence that her impairments were disabling.  *See Battles v. Sullivan*, 902 F.2d 657, 659 (8th Cir. 1990); *see also Guilliams*, 393 F.3d at 801 (RFC is what the claimant can still do despite her

---

[4] Ms. Robinson wrote a note in her opinion that due to autoimmune encephalopathy, Claimant is forgetful.  (AR at 1180.)  Claimant has not directed the Court to any treatment note indicating a diagnosis of this disorder prior to her LDI, although Claimant's hearing counsel gave an opening statement arguing that her then-recent diagnosis of autoimmune encephalopathy was consistent with symptoms Claimant had pre-LDI.  (*Id.* at 36.)  The only autoimmune disorder doctors discussed prior to Claimant's LDI was a possible lupus diagnosis.  Although the parties mention Claimant's counsel's opening argument in the Statement of Facts, Claimant makes no argument related to this disorder. Claimant has waived any argument based on this disorder. Acknowledging that prior counsel raised this argument at the hearing stage in a joint statement of facts is not enough to preserve the argument on appeal to this Court. *See Aulston v. Astrue*, 277 F. App'x 663, 664-65, 2008 WL 2066019 (8th Cir. 2008) (declining to address underdeveloped argument) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) (collecting cases for proposition that undeveloped arguments are waived)); *Rotskoff v. Cooley*, 438 F.3d 852, 854–55 (8th Cir. 2006) (considering undeveloped argument "abandoned for failure to provide any reasons or arguments for his contentions") (quotation omitted).

limitations). Claimant has not done so. Claimant's depression was classified as "moderate" by her healthcare providers. Claimant cites only one mention of night terrors in the relevant medical records. Ms. Robinson does not refer to any of these records in her opinion. In fact, it is Claimant's hearing counsel who mentions Claimant's allegedly disabling conditions. For example, question 7 on the opinion form Ms. Robinson completed states the following: "Do you anticipate Mary having absences from work due to her Fibromyalgia, Osteoarthritis, degenerative disc/joint disease, PTSD, Social Anxiety Disorder, Major Depressive Disorder and Bipolar, and related symptoms? YES/ NO." (*Id.* at 1181.) Ms. Robinson answered, "YES." In answer to the follow up question, which asked how many days on average Ms. Robinson anticipated Mary to be absent during the month, Ms. Robinson wrote "[more than half] the time." (*Id.*)

This question and all other similar questions—10 out of 15 major questions on the opinion form—are somewhat coercive and leading. They did not allow Ms. Robinson to rely entirely on her own memory, experiences, and medical impressions. Moreover, this question is not in concert with the treatment notes of Claimant's treating mental health providers. Claimant has not claimed that she has social anxiety disorder and none of the psychiatric treatment notes she cites diagnose social anxiety disorder. Although Claimant's hearing counsel told Claimant to focus on the relevant time period, when Claimant testified about anxieties she has had leaving her house and fears she has about meeting someone from her past when out in public (*Id.* at 47-49, 53-54), Claimant seemed to be testifying about current fears. The pages of treatment notes cited by Claimant have nothing to do with being in public. A review of other psychiatric treatment notes within the relevant time period, likewise, did not reveal discussions of social anxiety. (*Id.* at 585-95.)

Therefore, I find the ALJ was correct in finding that Ms. Robinson's "treating relationship started long after the relevant period and her statement that her opinions

14

encompassed the relevant time period are not supported." (*Id.* at 20.) Moreover, the ALJ is correct that an advanced nurse practitioner is a medical source who is not an "acceptable medical source" and thus "cannot establish the existence of a medically determinable impairment." SSR 06-03P. I recommend affirming the ALJ's decision on this issue.

### 2. *Opinion of Dan Courtney, Ph.D.*

Dan Courtney, Ph.D., was Claimant's psychologist and saw her a total of seven times between September 2016 and February 2017. (AR at 1096.) He wrote an opinion letter on March 14, 2017. (*Id.* at 1096-97.) At the time he wrote his opinion, Dr. Courtney mistakenly thought Claimant was already receiving Social Security benefits. (*Id.* at 1096.) Dr. Courtney stated, "[Y]ou asked about a date for the identification of her limitations. I note that she was last employed in 2009. It is clear she has had severe psychiatric problems her whole life." (*Id.*) Dr. Courtney noted that Claimant was first diagnosed with bipolar disorder in 2008, which is prior to the relevant time period. (*Id.*)

Dr. Courtney's opinion discusses Claimant's abusive childhood and how that trauma in conjunction with her various medical issues lead him to the conclusion that he does "not believe there would be any level of employment supervision that would result in [Claimant] adjusting to an employment setting." (*Id.* at 1096-97.)

Claimant argues that "it appears Dr. Courtney was providing retrospective opinions." (Doc. 10 at 8.) Claimant argues that by referring to Claimant's last date employed and by stating that Claimant had "severe psychiatric problems her whole life," Dr. Courtney "was aware of various aspects of Claimant's history during the relevant period." (*Id.*) Claimant further argues that the ALJ's failure to provide good reasons for the weight afforded to Dr. Courtney's opinion was not harmless because Dr. Courtney provided several opinions inconsistent with the ALJ's RFC. (*Id.*) The Commissioner

15

responds that while Dr. Courtney thought Claimant had lifelong psychiatric problems, his opinion addressed Claimant's functioning in March 2017. (Doc. 11 at 10.)

The Commissioner is correct. Before explaining whether he thought Claimant could work full time, Dr. Courtney did nothing more than provide background information as he understood it, apparently from Claimant's own reports. Dr. Courtney cites no medical records to support his opinion. (AR at 1096-97.) Noting a lifelong history of psychiatric problems does not constitute a retrospective diagnosis linked to the relevant time period. (*Id.* at 1096.) The statement is too broad to constitute a diagnosis and Dr. Courtney was clearly writing an opinion regarding Claimant's ability to work in 2017, not during the LDI. The part of the opinion regarding work restrictions is written in the present tense:

> She will have panic attacks . . . . [S]he demonstrates considerable avoidance of being out in public. . . . If she were able to make it to a workplace, it is my opinion that she would not be able to come close to a competitive employment schedule. She would need a considerable amount of nurturance and coddling for her to begin to feel safe and able to focus. I cannot imagine with the combination of her psychiatric and medical conditions that she would be able to make it past orientation.
>
> Consistent with the above is the observation that Mary would easily distort what other people are meaning or what their motivation is. She has become very reclusive both physically and cognitively. She loses emotional management the second she is triggered into any level of stress. . . . I do not believe that there would be any level of employment supervision that would result in her adjusting to an employment setting.
>
> In summary, Her psychiatric condition in itself seriously interferes with her capacity to function independently, appropriately, effectively, and on a sustained basis, and this is magnified by the array of medical conditions, some of which are clearly related to the way her mind deals with stress.

16

(*Id.* at 1097.)  Moreover, Dr. Courtney does not attribute Claimant's last date employed to psychiatric issues. (*Id.*)  He merely states it as a background fact with no embellishment or explanation.  (*Id.*)  The ALJ's decision on this issue should be affirmed.

### 3.  *Neuropsychological Evaluation by, and Opinion of, Brent Seaton, Ph.D.*

On November 10, 2017, Claimant presented for a neuropsychological evaluation with Brent Seaton, Ph.D. at the request of Ms. Robinson.  (*Id.* at 1193.) During the evaluation, Claimant and her husband told Dr. Seaton that Claimant had experienced cognitive decline over the "past 2 years or so."  (*Id.* at 1194.)  The problems had gotten worse over the then-preceding six months.  (*Id.*)  Dr. Seaton concluded that Claimant had a major neurocognitive disorder of unclear etiology; bipolar disorder, depressed episode, moderate; and PTSD (per history).  (*Id.* at 1199.)  He found evidence of cognitive decline and problems with attention, processing speed, and aspects of attention functions. (*Id.*)  Dr. Seaton was concerned that Claimant's medications had an impact on her cognitive functioning.  (*Id.*)

Claimant's hearing counsel provided Dr. Seaton with an opinion form that contained prompts similar to those contained in Ms. Robinson's opinion, which Dr. Seaton completed on April 26, 2018.  (*Id.* at 1396-97.) Dr. Seaton answered the YES/NO questions in ways that supported a conclusion that Claimant could not work. (*Id.*  at 1397.) On the last page of his opinion, Dr. Seaton wrote, "The patient has marked cognitive impairment that essentially precludes maintaining competitive employment." (*Id.* at 1398.)

Claimant argues "[w]hile Dr. Seaton's opinions did not expressly relate back, they do corroborate Dr. Courtney's retrospective opinions. The ALJ did not provide good reasons for the weight afforded to Dr. Seaton's opinions, which were supported by his November 2017 neuropsychological testing."  (Doc. 10 at 8.)

17

Claimant acknowledges that Dr. Seaton's opinions do not relate back to the relevant time period. At most, Dr. Seaton's November 2017 evaluation relates back to 2015 because it mentions cognitive decline "over the past two years." (*Id.* at 1194, 1199.) The fact that Dr. Seaton took Claimant's oral history and noted a history of mental health diagnoses does nothing to change the focus of Dr. Seaton's conclusions that, as Claimant admits "do not expressly relate back." On that basis, alone, the ALJ provided good reason to reject the opinions expressed in Dr. Seaton's evaluation. (*Id.* at 20.) Dr. Seaton's April 2018 opinion, like Ms. Robinson's opinion, was largely coached by Claimant's hearing attorney. The questions he was asked all related to work in 2018. (*Id.* at 1396-98.) The opinion form does not even mention Claimant's ability to work prior to her LDI. (*Id.* at 1397.) Dr. Seaton's handwritten comment is in the present tense, not backward-looking, and it does not relate to the relevant time period. (*Id.* at 1398.) Thus, the ALJ's decision to reject this opinion as being outside the relevant time period should be affirmed. (*Id.* at 20.)

### 4. Opinion of Ashley Courtney, Licensed Marriage and Family Therapist

Ashley Courtney, LMFT completed a Mental Medical Source Statement on July 9, 2018. (*Id.* at 1423-28.) At that time, Ms. Courtney had been treating Claimant for about eleven months. (*Id.* at 1423.). Ms. Courtney checked off many "signs and symptoms" that she felt Claimant exhibited from a list provided by Claimant's hearing counsel. (*Id.* at 1424.) She stated that she felt Claimant's mental health symptoms interfered with her daily activities to the point that she rarely left her home and that Claimant had several PTSD triggers. (*Id.*) Ms. Courtney stated that Claimant's memory issues had "become a barrier to her daily life as well." (*Id.*) She declined to comment on issues related to Claimant's mental abilities as they pertained to the ability to do work. (*Id.* at 1425-27.)

Claimant argues that "these opinions are also supportive of Dr. Courtney's retrospective opinions." (Doc. 10 at 8.) Whether Ms. Courtney's opinion is supportive of Dr. Courtney's opinion or not, I find that the ALJ properly rejected it as being outside the relevant time period. (AR at 20.) The opinion was written three and one-half years after Claimant's LDI by someone who did not meet Claimant until two and one-half years after Claimant's LDI. Moreover, as the ALJ noted, only "acceptable medical sources can establish the existence of a medically determinable physical or mental impairment." (*Id.*) Ms. Courtney is not an acceptable medical source. Finally, the ALJ properly rejected the opinion because the opinion says nothing about Claimant's impairments during the relevant time period, makes no mention of any dates prior to August 31, 2017, and says nothing about Claimant's ability to engage in work-related activities. In short, the ALJ properly rejected this opinion and the ALJ's decision should be affirmed.

### 5. Conclusion

In conclusion, I recommend affirming the decision of the ALJ assigning no weight to these opinions.

### B. The ALJ properly accounted for Claimant's moderate deficiencies in concentration, persistence, and pace in the RFC.

At step three of the five-step process, the ALJ found Claimant had moderate limitations in "concentrating, persisting, or maintaining pace." (AR at 16.) The hypotheticals presented to the VE did not contain that limitation, however. Instead, the hypothetical that became the RFC contained only the following relevant limitations: "She would be limited to a job that could be learned in 30 days or less. She could have had only occasional contact with the public, co-workers and supervisors." (*Id.* at 70.) Claimant argues that remand is required because the ALJ presented a deficient hypothetical to the VE. (Doc. 10 at 3-4 (citations omitted).)

19

The ALJ relied, in part, on the opinions of the state agency consulting reviewing psychologists, Scott Schafer, Ph.D. and Sarah Anthoney, Ph.D., who found, in relevant part, that Claimant's ability to maintain attention and concentration for extended periods was moderately limited. (*Id.* at 83, 100.) The consultants concluded Claimant maintained the ability to perform tasks not requiring sustained attention or extensive contact with others. (*Id.* at 85, 101.) The consultants noted that claimant "reported problems following instructions, did not have contact with authority figures, and did not handle changes in routine well." (*Id.* at 85, 101.) The ALJ gave their opinions partial weight because they were "somewhat consistent with the record as a whole." (*Id.* at 20.)

Relying on *Chismarich v. Berryhill,* 888 F.3d 978, 980 (8th Cir. 2018), the Commissioner responds that "different steps [of the five-step process] serve distinct purposes, the degree of precision required at each step differ, and a court's deferential standard of review precludes a court from labeling findings as inconsistent when the court can harmonize them." (Doc. 11 at 4.) The Commissioner argues that the ALJ's step three finding of moderate limitations in concentration, persistence, or pace can be harmonized with the finding Claimant "could do unskilled work with limited personal contact [because] [u]nskilled work allows for some leeway in concentration, persistence, or pace because it is 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" (*Id.* at 4-5) (quoting 20 C.F.R, § 404.1568(a).)

Limiting Claimant to jobs that could be learned in thirty days meant that Claimant was limited to unskilled work. *See* 20 C.F.R. § 404.1568(a) (An unskilled job is, among other things, one "a person can usually learn to do . . . in 30 days."); AR 23 (the ALJ referred to erosion of the "unskilled light occupational base"). Therefore, "unskilled jobs" can be substituted for "jobs that could have been learned in thirty days or less" in the hypothetical. In relevant part, the revised hypothetical reads, "[S]he was limited to

20

unskilled jobs; and she could only have occasional contact with the public, coworkers, and supervisors." The next question becomes whether this hypothetical was sufficient or whether the ALJ was required to include the moderate limitations on concentration, persistence, and pace that she found at step three.

In order to constitute substantial evidence, a vocational expert's testimony must be based on a hypothetical that captures the "concrete consequences" of the claimant's deficiencies. *Scott v. Berryhill,* 855 F.3d 853, 857 (8th Cir. 2017) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation omitted); *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)).

Claimant argues that her case is similar to *Newton v. Chater*, 92 F.3d 688 (8th Cir. 1996). In *Newton*, the ALJ proffered a hypothetical question to the VE that described a person with limitations that included, among other things "a capacity for simple jobs." 92 F.3d at 694. The claimant argued that the hypothetical question was insufficient "because it omitted medical evidence of his deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner." *Id.* The medical consultants had found the claimant had moderate and marked limitations in his abilities to carry out instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal work week, and perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 690, 695. The ALJ "stated on the Psychiatric Review Technique Form attached to the decision that [the claimant] 'often' ha[d] deficiencies of concentration, persistence, or pace." *Id.* at 695.

*Newton* held that the ALJ erred by not including the deficiencies in the hypothetical because the VE's testimony was not based on "the full extent of [the claimant's] limitations and his testimony could not have constituted substantial evidence to support the Commissioner's decision." *Id.* The court relied, in part, on the VE's testimony that

21

a "moderate deficiency in these areas . . . would cause problems on an ongoing daily basis, 'regardless of . . .what the job required from a physical or skill standpoint.'" *Id.* (second set of ellipses in original). Thus, the VE's testimony may have been different if the limitations had been included in the hypothetical question. *Id.*

Claimant also relies on *Scott*. In *Scott*, the ALJ found at step three that the claimant had moderate limitations in concentration, persistence, or pace. 855 F.3d at 855. At step three, the ALJ also noted the following:

> Scott is able to cook, help feed his sister's calves, do laundry, dust, drive short distances, and care for personal hygiene. Although Scott reads and writes poorly and cannot balance a checkbook, he communicates effectively, can perform simple math, requires no reminders to complete chores, and is able to focus enough to watch television three hours per day.

*Id.* "The RFC hypothetical provided for medium, unskilled work involving 'personal contact that is incidental to the work performed,' requiring 'little independent judgment . . . [and] simple, direct, and . . . very brief' supervision. The complexity of tasks was limited to 'tasks [that] can be learned and performed by rote.'" *Id.* at 858 (alterations in original). *Scott* held that this hypothetical captured "the concrete consequences" of the claimant's impairments. *Id.*

The Commissioner argues that the case at bar can be distinguished from *Newton* and *Scott*. (Doc. 11 at 6.) The Commissioner first argues that the claimant in *Newton* had "more deficiencies than were denoted with a one-word rating of 'moderate,'" which is why "simple work did not account for this claimant's limitations." (*Id.*) The Commissioner asserts that Claimant here "did not prove similar deficiencies." (*Id.* (citing AR 79, 83-84, 95-96, 100-03).)

The Commissioner asserts that *Scott* does not even apply to the instant case because "the ALJ did not expound on [Claimant's] rating of moderately limited concentration, persistence, or pace at step three." (Doc. 11 at 6 (citing AR at 16).) Therefore, according

to the Commissioner, Claimant "cannot borrow from the ALJ's step 3 discussion to bolster her claim that her moderate rating should have had more impact at the work capacity step." (*Id.*)

The Commissioner further asserts that the medical evidence supports the ALJ's decision. (*Id.* at 7-8.) The Commissioner notes that the ALJ gave partial weight to the opinion of state agency consulting psychologist Scott Shafer, Ph.D., who reviewed Claimant's records during the relevant time period and whose "step 3 ratings were substantially the same as the ALJ's. . . . [and whose] opinion that plaintiff could do tasks as long as they did not require sustained attention or extensive contact with others was very like the ALJ's work capacity finding." (*Id.* at 7 (internal citations omitted).) The Commissioner also states that Dr. Schafer found that Claimant had no significant limitation in working with both short and detailed instructions, acting within a schedule, sustaining an ordinary routine, and working with others. (*Id.* (citing AR 79, 83-84; "*Cf. Newton,* 92 F.3d at 695 (greater deficiencies")).) The Commissioner further argues that the treatment notes cited by the consulting psychiatrists and the ALJ and Claimant's activities of daily living noted by the ALJ support the ALJ's decision. (*Id.* at 8.)

Claimant argues that "the whole point of *Newton v. Chater* as explained recently in *Scott v. Berryhill*—while the ALJ does not need to expand significantly on a simple or unskilled work limitation to account for moderate limitations in concentration, persistence or pace, *the ALJ must do something*." (Doc. 12 at 2 (emphasis in original).) Therefore, an unskilled work limitation, alone, is not "equivalent to simple, routine tasks and decisions and few workplace changes." (*Id.*) The Claimant further argues that the state agency consultants' opinions support a finding that she is "moderately limited in maintaining attention and concentration for extended periods and completing a normal workday and work week without interruption form [sic] psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest

periods." (*Id.*) According to Claimant, a limitation to jobs that can be learned in 30 days does not account for "limitations involving no sustained attention." (*Id.* at 2-3.)[5]

The Commissioner is correct. The only opinions the ALJ gave any weight were the opinions of the state agency reviewing consultants. (AR 20.) The consultants concluded that Claimant maintained the ability to perform tasks not requiring sustained attention or extensive contact with others. (*Id.* at 85, 101.) The ALJ acknowledged that the consulting psychologists opined that Claimant retained the ability to perform tasks not requiring sustained attention or extensive contact with others. (*Id.*) The ALJ, however, only found these opinions to be "somewhat consistent with the record as a whole" and therefore only assigned them partial weight. (*Id.* (citing exhibits 1F-5F, 7F, 8F).) The part of the consultants' conclusion that the ALJ rejected was that Claimant "maintained the ability to perform tasks not requiring sustained attention." The cited exhibits contain some treatment notes that fall outside of the relevant time period. Moreover, because Claimant changed her alleged onset of disability date at the hearing, the consulting psychiatrists were looking at a broader period of time than the ALJ or the Court. (*Id.* at 84.) I have only considered treatment notes from the relevant time period.

A review of treatment notes from the exhibits cited by the ALJ supports the conclusion that the ALJ did not intend to adopt the consulting psychologist's limitations of "tasks not requiring sustained attention" into the RFC. I can find no treatment notes that support such a limitation and Claimant does not direct the Court to any such treatment

_____

[5] For support, Claimant also cites the Social Security Program Operations Manual ("POMS"), which states that to engage in unskilled work, a claimant must be able to "maintain attention for extended periods of 2-hour segments (concentration is not critical)." https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010. "[T]he POMS have no legal force and are not binding on the Commissioner." *Hosch v. Colvin*, No. C15-2014-CJW, 2016 WL 1261229, at *6 (N.D. Iowa Mar. 30, 2016) (citing *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000)).

note. There are not many treatment notes that specifically evaluate these qualities, but the ones that do state that Claimant's concentration and attention were either normal or fair. (*Id.* at 581-87.) Other treatment notes in the exhibits cited by the ALJ noted that Claimant was alert, oriented in three spheres, cooperative, did not have little interest or pleasure in doing things, and had intact memory and appropriate mood and affect. (*E.g., id.* at 383, 403, 583, 589, 640, 648.) As the ALJ noted, in December 2014, Mr. Vold stated that Claimant had goal-directed thought processes, could follow directions, and could focus well during the interview. (*Id.* at 84-85, 577.) Claimant did not discuss a need for breaks or an inability to focus or concentrate with her healthcare providers.

Moreover, Claimant is not correct that an ALJ must do something in every case beyond adopting simple or unskilled work limitations to account for moderate limitations. The Court must look at each case individually and evaluate whether the ALJ properly incorporated the claimant's limitations into the RFC. For example, in *Hosch v. Colvin*, the ALJ found the claimant had moderate limitations in concentration, persistence or pace in his "'paragraph B' criteria analysis at Step Three." No. C15-2014-CJW, 2016 WL 1261229, at *5 (N.D. Iowa Mar. 30, 2016). "[T]he ALJ recognized that the limitations identified in the 'paragraph B' criteria are used to rate the severity of mental impairments at Steps Two and Three of the sequential process. . . . [and] that the RFC analysis requires a more detailed assessment." *Id.* The ALJ went on to make that assessment by reviewing the evidence in the record and crafting the RFC, which limited the claimant to "simple, routine tasks, involving only simple, work-related decisions and few workplace changes." *Id.* The claimant argued that the hypothetical presented to the VE should have included the limitation to moderate limitations in concentration, persistence, or pace. *Hosch* held that the limitations in the hypothetical accounted for moderate limitations in concentration, persistence, and pace because the Eighth Circuit and several other courts

hold that "moderate limitations in concentration persistence, or pace are consistent with simple, routine, repetitive tasks involved in unskilled work." *Id.* The court reasoned:

> Once the ALJ determines that the claimant's mental impairment is severe, but does not meet or equal a listing, an ALJ must then assess the claimant's RFC. 20 C.F.R. § 416.920a(d)(3); SSR 96-8p. Although an ALJ must evaluate a claimant's limitations in these four categories, these ratings are not the same as an RFC assessment. SSR 96-8p. Because the rating of limitations in the four categories and the limitations in the RFC assessment do not serve the same purpose, an ALJ need not recite the "paragraph B" limitations in his RFC finding. *Id*; *Gann v. Colvin*, No. C 14-4026-MWB, 2015 WL 1242706, at *26 (N.D. Iowa Mar. 18, 2015) (unpublished) (rejecting argument that findings at Step Two and Three automatically require ALJ to include corresponding limitations in RFC); *Crane v. Colvin*, No. 4:13-046-DGK-SSA, 2014 WL 460858, at *4 (W.D. Mo. Feb. 5, 2014) (unpublished) (distinguishing the "special technique" used at Steps Two and Three from RFC assessment).
>
> Here, the ALJ recognized that the limitations identified in the "paragraph B" criteria are used to rate the severity of mental impairments at Steps Two and Three of the sequential process (AR 12). The ALJ further stated that the RFC analysis requires a more detailed assessment by itemizing the various functions contained in the broad "paragraph B" categories (AR 12). The ALJ reviewed the evidence and made such an assessment. . . . Based on these findings, the ALJ limited plaintiff to simple, routine tasks, involving only simple, work-related decisions and few workplace changes (AR 12). The ALJ stated that this RFC finding reflected the degree of limitation he found in the "paragraph B" analysis (AR 12).

*Id.* The court further reasoned that even if the ALJ had not included any mental limitations in the hypothetical, he would not have erred because moderate paragraph B limitations do not necessarily require mental limitations in the RFC assessment. *Id.* at *6 (citing *Flint v. Colvin*, No. 13-CV-1220 PAM/SER, 2014WL 2818665, at *27 (D. Minn. June 23, 2014)).

The case at bar is most analogous to *Hosch*. At step three, the ALJ found that Claimant had moderate limitations in concentrating, persisting, and maintaining pace.

(AR at 16.)  At step three, the ALJ also stated the following without further explaining the step three finding.

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental functional analysis.

(*Id*. at 17.)  Like the ALJ in *Hosch*, the ALJ in this case then went on to craft the RFC and discuss the evidence in the record.  I have already explained why the ALJ properly rejected the post-LDI opinion evidence.  Thus, the only opinion evidence she considered were the opinions of the state consultants, which she only gave partial weight.  The treatment notes the ALJ cited do not support the consultants' conclusion that Claimant's attention, concentration, and pace were only adequate for tasks not requiring sustained attention.  (AR at 83-84, 100-01.)

This case can be distinguished from *Newton* not only because the claimant in *Newton* had more pronounced deficiencies than Claimant, but also because the *Newton* VE testified that the claimant's moderate concentration, persistence, and pace deficiencies would cause ongoing problems in all types of work.  92 F.3d at 691.  There was no such testimony in this case.  The VE in this case testified that no work would be available to Claimant if she worked at a slow pace for greater than 20% of the day.  (AR at 71.) However, Claimant does not proffer this testimony in support of her position and Claimant does not indicate where her hearing counsel derived the 20% figure he used to frame this question.

On her adult function report, Claimant stated she did not have problems completing tasks.  (*Id*. at 272.)  This further supports the ALJ's decision. Although she

stated she had trouble paying attention, saying she had to read recipes multiple times (*Id.*), as discussed above, her healthcare providers did not agree that she could not follow instructions. More importantly, limiting Claimant to unskilled work addressed any difficulties Claimant had with instructions. In addition, as the ALJ stated, during the relevant time period, Claimant was providing daycare for her grandson and "loving this daily job," "doing more activities with her grandkids," and was preparing for a garage sale. (*Id.* at 21 (citing AR at 66, 394, 419, 577, 593).) These activities required Claimant's sustained attention.

Finally, the Commissioner is correct that the *Scott* ALJ included a thorough explanation of "moderate impairments" at step three. More importantly, the *Scott* hypothetical included concrete consequences of the claimant's deficiencies that the ALJ found credible. *See* 855 F.3d at 858. The same is true in this case. It may have been preferable for the ALJ to identify the parts of the consultants' opinions she found consistent with the record as a whole and what parts she did not find consistent, and to cite exactly to the record. Nevertheless, the ALJ's writing style did not have an effect on the outcome of the case. It was possible to follow the ALJ's reasoning and to find the relevant documents. *See Buckner v. Astrue*, 646 F.3d 549, 560 (8th Cir. 2011) ("[T]he ALJ's arguable deficiency in opinion-writing technique had no bearing on the outcome of [the] case and does not require remand.") (internal quotation omitted).

The record as a whole supports the ALJ's decision. The ALJ cited to the record to support her decision and Claimant cites no evidence in the record that undermines that decision. The ALJ was only required to include in her hypothetical the impairments she found supported by the record. *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005) ("A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true.") (citing *Hunt v. Massanari,* 250 F.3d 622, 625 (8th Cir. 2001)). It is obvious what part

of the consultants' opinions the ALJ adopted and rejected, and therefore, the ALJ's hypothetical contained the concrete consequences of Claimant's impairments that she found credible, *Scott*, 855 F.3d at 858, and that I find supported by the record as a whole. I recommend the District Court affirm the ALJ's decision on this issue.

**C.    *The ALJ was appointed in a constitutional manner.***

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049.  Claimant argues that Social Security Administration ("SSA") ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*.  (Doc. 10 at 11-17.)  Claimant asserts this Court should vacate the denial of benefits by ALJ Bruntz and remand the case for decision by what she contends is a properly-appointed ALJ.  (*Id.* at 11.)  Claimant admits she is asserting this Appointments Clause challenge for the first time in her brief to this Court.  (*Id.* at 14-16.)

Claimant argues that her case presents a difference from most of the other cases that I have previously addressed.   In July 2018, while Claimant's case was in the administrative process, then-Acting Commissioner of Social Security Berryhill ratified the appointments of all Social Security ALJs.  (*Id.* at 15.)  Claimant argues that Ms. Berryhill had no power to appoint the ALJs because "the Federal Vacancies Reform Act as it relates to temporary Department Heads may only be constitutional as it relates to temporary appointments, since a principal officer requires Senate confirmation."  (*Id.* at 16 (citing *United States v. Eaton*, 169 U.S. 331, 343 (1898).)  Claimant argues that Ms. Berryhill was an inferior officer who did not have the power to appoint other inferior officers, in this case, ALJs.  (*Id.* at 16-17 (citing *NLRB v. SW Gen., Inc.* 137 S. Ct. 929, 946 (2017) (Thomas, J., concurring)).)  Claimant asserts that because this issue "still needs addressed [sic] by the agency's first proper Commissioner in years," the Court

should exercise *Freytag* discretionary review of her Appointments Clause challenge, even though it was not timely raised during the administrative process.[6]  (*Id.* at 17.)

The Federal Vacancies Reform Act provides the following:

(a) If an officer of an Executive agency . . . whose appointment to office is required to be made by the President, by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office--

> (1) the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity . . .;
> (2) notwithstanding paragraph (1), the President (and only the President) may direct a person who serves in an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate, to perform the functions and duties of the vacant office temporarily in an acting capacity. . .; or
> (3) notwithstanding paragraph (1), the President (and only the President) may direct an officer or employee of such Executive agency to perform the functions and duties of the vacant office temporarily in an acting capacity. . . .

5 U.S.C. § 3345.  Thus, a plain reading of the Act gave Acting Commissioner Berryhill the authority to appoint ALJs because that is one of the "functions and duties" of the office she was fulfilling in her capacity as Acting Commissioner of Social Security.

In addition, the cases cited by Claimant are unhelpful to her argument.  Claimant quotes *United States v. Eaton*, 169 U.S. 331, 334 (1898): "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions, he is not thereby transformed into the superior and permanent official."  (Doc. 10 at 16.)  *Eaton* addressed the appointment of a Vice Consul to Siam who was appointed by the Consul to Siam to perform the duties of the

---

[6] The Eighth Circuit has interpreted *Freytag v. Commissioner*, 501 U.S. 868 (1991), to allow a reviewing court the permission, though not the obligation, "to hear a belated appointments clause challenge." *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 795 (8th Cir. 2013).

Consul when the Consul became too ill to fulfill his duties and returned to the United States. 169 U.S. at 332-33. *Eaton* did not address the duties that a temporarily-appointed inferior officer could perform. Rather, the case only addressed the time that a Vice Counsel performed the duties of Consul, rather than the nature of the duties they were allowed to perform.

> Although section 2 of article 2 of the constitution requires consuls to be appointed by the president 'by and with the advice and consent of the senate,' the word 'consul' therein does not embrace a subordinate and temporary officer like that of vice consul, as defined in the statute. The appointment of such an officer is within the grant of power expressed in the same section, saying: 'But the congress may by law vest the appointment of such inferior officers, as they think proper, in the president alone, in the courts of law or in the heads of departments.' Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered. The manifest purpose of congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed by the vice consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word.

*Id.* at 343. Therefore, nothing in *Eaton* prevented Ms. Berryhill from performing all the duties of the Commissioner while acting in that capacity. *Eaton* states that during the time the Vice Consul served as Consul, he was "charged with the performance of the duty of the superior," just as Ms. Berryhill was so charged in this case. Furthermore, the *Eaton* Court reasoned that the rule allowing for the appointment of a Vice Counsel under the circumstances presented in the case served the public interest and prevented closure of the consular office. *Id.* at 342-43. Similar goals are served here. If Ms. Berryhill was not authorized to ratify the appointments of sitting ALJs after *Lucia*, and

31

her replacement was not yet nominated by the President and approved by the Senate, "evil consequences" would result. *Id.* at 342. All the work of the SSA would effectively be open to Appointments Clause challenges. This is an absurd result.

Likewise, *Morrison v. Olson*, 487 U.S. 654 (1988) is not on point. *Morrison* addressed whether the independent counsel provisions of the Ethics in Government Act violated the Appointments Clause. 487 U.S. at 659-60. The Court held that special counsel were "'inferior officers' in the constitutional sense" due to the fact that the role is "restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes." *Id.* at 671-72. The Court recognized that special counsel were given full power and independent authority "to exercise all investigative and prosecutorial functions and powers of the Department of Justice," but only within the scope of the jurisdiction granted and not with the power to formulate policy. *Id.* In the case at bar, Claimant proffers no evidence indicating that Ms. Berryhill's authority was so limited during her tenure as Acting Commissioner. Rather, it appears that Ms. Berryhill was fulfilling all the duties of the Commissioner while in that role.[7]

---

[7] Ms. Berryhill actually held the title of Acting Commissioner of Social Security twice. She first assumed the role on January 21, 2017. Mar. 6, 2018 letter from GAO Gen. Counsel Thomas H. Armstrong to Pres. Trump, https://www.gao.gov/assets/700/690502.pdf. On March 6, 2018, the GAO determined that her term should have ended on November 17, 2017 in accordance with the FVRA. *Id.* Immediately following the GAO's notification in March 2018, Ms. Berryhill "stepped down from her role as Acting Commissioner and continued to lead the agency from her Deputy Commissioner of Operations position of record. . . . . [H]owever, on April 17, 2018, the President nominated Mr. Andrew Saul to be the next Commissioner of Social Security. . . . The FVRA contains a 'spring-back' provision that enabled Berryhill to resume her role as Acting Commissioner as of the date of Mr. Saul's nomination." *Patterson v. Berryhill*, No. 2:18-CV-00193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (citing 5 U.S.C. § 3346(a)(2) (providing that, once a first or second nomination for the office is submitted to the Senate, an acting officer may serve from the date of such nomination for the period the nomination is pending in the Senate)) (internal citations omitted). As discussed above, it is my view that Ms. Berryhill had the power to fulfill all the duties of the Commissioner while holding that title. To the extent Claimant is pursuing some sort of "lapse or gap in authority" argument for the time

32

Claimant also cites *NLRB v. SW Gen., Inc.*, where Justice Thomas wrote separately "to explain [his] view that the Appointments Clause likely prohibited [NLRB's general Counsel's] appointment." 137 S. Ct. 929, 945 (2017) (Thomas, J., concurring). However, the portion of the concurrence quoted by Claimant addresses an issue the majority did not address and is not binding. *Id.* at 946 ("The dissent's conclusion that the FVRA authorized the appointment in this case . . . implicates an important constitutional question that the Court's interpretation does not: Whether directing Lafe Solomon to serve as acting general counsel of the National Labor Relations Board . . . without the advice and consent of the Senate, complied with the Constitution. I write separately to explain my view that the Appointments Clause likely prohibited Solomon's appointment.").

None of the cases cited by Claimant addressed challenges to the appointments of inferior officers by temporarily-appointed officers. Therefore, Claimant's arguments do not convince me that this case requires remand based on Ms. Berryhill's status at the time she reappointed ALJ Andrews.[8] Thus, none of Claimant's arguments convince me that the unique posture of this case requires remand. Moreover, Claimant failed to raise any of her arguments during the administrative process.

_____

Ms. Berryhill led the agency as Deputy Commissioner of Operations even though the act he takes issue with in this case was performed when she had the title of Acting Commissioner, I find that she had full authority to carry out all the Commissioner's duties at that time, too. *See* Providing an Order of Succession Within the Social Security Administration, 81 FR 96337, 2016 WL 7487744 ("[T]he following officials of the Social Security Administration, in the order listed, shall act as and perform the functions and duties of the office of the Commissioner of Social Security (Commissioner), during any period in which both the Commissioner and Deputy Commissioner of Social Security have died, resigned, or become otherwise unable to perform the functions and duties of the office of Commissioner").

[8] I am not sure what Claimant would have had Ms. Berryhill do other than re-appoint the SSA ALJs with *Lucia* as precedent and no permanent successor ready to take office.

In support of her general argument that exhaustion is not required, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council. (Doc. 10 at 13 n.7.) However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies to challenges timely raised before the Appeals Council or previously raised at the ALJ level. 2019 WL 1202036, at *9583; *see also Murphy*, 2019 WL 2372896, at *7 (addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it for the first time in the district court).

Claimant also cites *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019), *affirmed*, *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020); *Probst v. Berryhill*, No. 5:18-cv-130-JG, 2019 WL 1749135 (E.D.N.C. March 22, 2019), *appeal docketed*, *sub nom Probst v. Saul*, No. 19-1529 (4th Cir. May 17, 2019); and other non-binding cases and encourages the Court to adopt *Bizarre's* reasoning in this case. (Doc. 10 at 13.) The *Bizarre* court held that it did "not believe that [the claimant] was required to raise her [Appointments Clause challenge] before the ALJ or Appeals Council in the first instance or that failure to do so worked a forfeiture of that claim." 364 F. Supp. 3d at 425. I respectfully disagree and decline to adopt the *Bizarre* court's holding. Instead, I agree with the holding in *Murphy*: "[T]he court respectfully disagrees with the *Bizarre* court's holding. This court believes that failure to raise an Appointments Clause challenge before the ALJ or Appeals Council at the agency level waives the issue on judicial review at the district court level." 2019 WL 2372896, at *7 (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013); *Anderson v. Barnhart*, 344 F.3d 809, 814) (8th Cir. 2003)).

Furthermore, the recent decision in *Griffin v. Comm'r of Soc. Sec.* addressed the Third Circuit's decision in *Cirko ex rel Cirko v. Comm'r of Soc. Sec.*, No. 19-1772, -- F.3d --, 2020 WL 370832 (3d Cir. Jan. 23, 2020), which affirmed *Bizarre*, and provided

34

additional reasons why *Murphy* is still the better view. No. 18-CV-85-LRR, 2020 WL 733886 (N.D. Iowa Feb. 13, 2020).

> [I]n *Ramazetti v. Comm'r of Soc. Sec.*, No. 8:19-cv-260-T-MAP, 2020 WL 428950 (M.D. Fla. Jan. 28, 2020), the district court determined that the claimant's Appointments Clause challenge failed because the claimant waived the issue by not raising it before the ALJ or Appeals Council. *See id*. at *8. Further, the district court stated that "[t]he Supreme Court in *Lucia* did not make a blanket finding that all ALJs are subject to the Appointments Clause, just that SEC ALJs are so subject." *Id.* The district court points out that, "[a]t the time the Supreme Court decided *Lucia*, the SEC had only five ALJs. . . . In contrast, there are currently over 1,700 Social Security Administration ALJs." *Id.* The district court also notes that "[t]he Social Security Administration annually receives about 2.6 million initial disability claims and completes about 689,500 ALJ hearings; in 2018, it took an average 809 days to process a claim from its initial receipt to an ALJ decision, with more than 850,000 people waiting for ALJ hearings." *Id.* The district court concluded that "[i]f courts were to apply *Lucia* to Social Security cases as Plaintiff argues this [c]ourt should, millions of cases would need [to] be remanded for rehearing by a different ALJ. Given these important efficiency concerns and the Supreme Court's specific findings in *Lucia*, the [c]ourt is skeptical that *Lucia* is even controlling as to Social Security Administration ALJs." *Id.* (quoting *Miaolino v. Comm'r of Soc. Sec.*, No. 2:18-cv-494-FtM-UAM, 2019 WL 2724020 (M.D. Fla. July 1, 2019)).

*Id.* at *10 (all alterations except first set of brackets in original).

This Court has ruled in favor of the Commissioner on similar claims on several occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*, No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v. Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer*

*v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019); *Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

Finally, although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-18003 prevented the ALJ from addressing the issue (Doc. 10 at 13 n.7), nothing stopped Claimant from raising the issue during the administrative process and preserving it for appeal.[9]

---

[9] Claimant urges the Court to stay decision on this issue pending the Eighth Circuit's resolution of the issue. (Doc. 10 at 11 n.6 (citing, *inter alia*, Order, *Trimble v. Comm'r, SSA,* No. 8-18-cv-162 (D. Neb. Feb 8, 2019).) In addition to the precedent cited by Claimant, I am also aware of the Honorable Rebecca Goodgame Ebinger's decision to stay her decision on this issue pending the Eighth Circuit's decision on this issue. Order at 5, *Harwell v. Saul*, No. 4:18-cv-00296-RGE-HCA (S.D. Iowa Mar. 2, 2020) (Doc. 24). Furthermore, I am mindful of the recent decision in *Wang v. Saul*, No. 18-cv-3144 (DTS) (D. Minn. Feb. 28, 2020), in which the Honorable David T. Schulz "decline[d] to follow the decisions in this District and those of the district courts within the Eighth Circuit that impose an exhaustion requirement upon Appointments Clause claims concerning SSA ALJs." Order at 14, *Wang*, No. 18-cv-3144 (DTS) (Doc. 23). I have also considered *Associated Mortgage Bankers, Inc. v. Carson*, 17-0075 (ESH), 2019 WL 108882 at *6 (D.D.C. Jan. 4, 2019), cited by Claimant. (Doc. 12 at 9.) In making my recommendation, I respectfully decline to follow these decisions. *See* Order at 12-13, *Dewbre v. Comm'r, Soc. Sec.*, No. 18-cv-4055-LRR-KEM (N.D. Iowa Sept. 12, 2019) (Doc. No. 17).

## IV.    CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm** the decision of the ALJ and **dismiss the case with prejudice**.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.    Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 12th day of May, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa